**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| VY NHU HOANG DINH and MAN VAN CHAU,<br><br>                Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA; JEH C. JOHNSON, Secretary of Department of Homeland Security; ERIC H. HOLDER, JR., Attorney General of the United States; ALEJANDRO MAYORKAS, Director of United States Citizenship and Immigration Services; and LEANDER B. HOLSTON, Officer in Charge of United States Citizenship and Immigration Services in Las Vegas, Nevada,<br><br>                Defendants. | Case No. 2:12-cv-01795-APG-CWH<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REMANDING THE MATTER TO UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES**<br><br>(Dkt. No. 13.) |

## I.    BACKGROUND

This dispute arises from a series of three marriages between plaintiff Vy Nhu Hoang Dinh ("Dinh"), a Vietnamese citizen, and three American citizens: Jason Prince ("Prince"), Joey Duran ("Duran"), and plaintiff Man Van Chau ("Chau"). Dinh is presently married to Chau.[1]

In March 2002, Dinh entered the United States on an F-1 non-immigrant student visa.[2] In May 2004, when Dinh was a student at the College of Southern Nevada in Las Vegas ("CSN"),

---

[1] Dinh and Chau are collectively referred to as "Plaintiffs."

[2] For F-1 student visa requirements, see 8 U.S.C. § 1101(a)(15)(F) and 8 C.F.R. § 214.2(f). "[A]n F-1 student is admitted [to the United States] for duration of status. Duration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution approved by the Service for attendance by foreign students, or engaging in authorized practical training following completion of studies." 8 C.F.R. § 214.2(f)(5)(i). In some circumstances, a student admitted on an F-1 visa can extend her stay upon employment. *Id.* § 214.2(f)(5)(vi).

1  Dinh's mother, Thi Uyen Hoang ("Hoang"), called Dinh from Vietnam to tell her that the family

2  was in financial trouble and that Hoang would not be able to keep paying Dinh's educational

3  expenses.  Hoang told Dinh about a matchmaker Hoang had met in Vietnam, Mr. Hoa ("Hoa"),

4  and that Dinh might have to marry someone of Hoa's and Hoang's choosing in order to keep

5  studying in the United States.  Dinh asserts that arranged marriages are quite common in

6  Vietnam, as is obeying one's parents' selection of a spouse.

7         **A.**    **The Prince Marriage**

8        One month later, on June 2, 2004, Dinh met with Hoa in person in Utah. She paid him

9  $12,000 and he introduced her to Prince.  That same day, Dinh and Prince were married.

10  Immediately after the ceremony, Dinh returned to Las Vegas.  About ten days later, she received

11  a "divorce paper" from Hoa concerning her marriage to Prince.  (AR 126.)  Dinh contacted her

12  mother, who told Dinh to do as Hoa said.  Dinh's divorce from Prince was final on October 27,

13  2004.  (AR 503–05.)

14        Sometime between November 2 and 22, 2004, Dinh applied to two colleges in Utah:

15  University of Utah College of Nursing and Westminster College International.  (AR 105–09.)

16         **B.**    **The Duran Marriage**

17        Hoang ordered Dinh to go to Utah in late November 2004.  Upon arriving in Utah, Hoa

18  introduced her to Duran.[3]  They were married on November 26, 2004.  Immediately following the

19  ceremony, Dinh signed a Form I-485 Application to Register Permanent Resident or Adjust

20  Status, although she asserts that she did not date that form.

21        Dinh immediately returned to Las Vegas to finish the academic semester at CSN.  She

22  claims that she intended to return to Utah in January 2005 to cohabitate with Duran and establish

23  a married life with him.

24        By January 2005, however, Dinh asserts that Duran had stopped returning her phone calls

25  and she understood that he did not want to establish a life with her.  Dinh called her mother, who

26

27           [3] The record is unclear as to whether they were married on the same day as their first meeting or

28  whether they met the day before.

gave Dinh permission to divorce Duran.  Dinh claims that she instructed her mother to tell Hoa to cancel the arrangement and *not* to file any of the immigration paperwork associated with Dinh's marriage to Duran.  Hoang agrees that she "called if off."  (Hoang Aff., AR 130.)  It is unclear why Hoa or Duran ever received the message that Dinh did not want the immigration paperwork to be filed.

Later in January 2005, Dinh traveled to Philadelphia, Pennsylvania to visit a friend in dental school.  While there, she met Chau.  They immediately hit it off and began dating.  (Dinh Aff. ¶¶ 12–13, AR 118.)

On March 30, 2005, United States Citizenship and Immigration Services ("USCIS") received the Form I-485 signed by Dinh and a Form I-130 Petition for Alien Relative with Duran as the petitioner and Dinh as the beneficiary.  The Form I-130 Petition serves to classify the beneficiary as an immediate family member of the petitioner; the Form I-485 serves to adjust the beneficiary's status to temporary legal permanent resident ("LPR") once the immediate family classification is granted.

On August 30, 2005, the divorce decree for the Dinh-Duran marriage was entered in Utah. (AR 500–01.)

On March 6, 2006, USCIS rejected the immigration forms filed in March 2005 in relation to the Dinh-Duran marriage.  (AR 538.)

### C. <u>The Chau Marriage</u>

On October 4, 2006, Dinh and Chau married in Las Vegas.  After finishing dental school, Chau moved to Las Vegas, where he and Dinh still reside.  On October 12, 2006, Chau executed a Form I-130 Petition on Dinh's behalf, and Dinh executed another Form I-485 on her own behalf.  On October 23, 2006, they submitted these forms to USCIS.  (AR 133–36, 514–15.)  On the Form I-485, Dinh indicated that she had never before applied for permanent resident status in the United States.  (AR 134.)

On October 10, 2007, the U.S. Attorney in Utah charged Duran with misdemeanor aiding and abetting the attempted entry of an illegal alien under 8 U.S.C. §§ 2 and 1325(a)(3).  (AR 282–83.)  Duran pled guilty, and, on November 2, 2007, a judgment and conviction was rendered

against Duran.  (AR 284.)  Hoa was separately indicted for a conspiracy to arrange marriages between American men and Vietnamese women in which the men allegedly received a kickback and the women were allegedly unaware of the scam.  (AR 315–87.)  Dinh was never criminally indicted.

On February 14, 2008, Plaintiffs filed a petition for writ of mandamus in this Court, seeking a mandate that USCIS adjudicate the pending Form I-130 Petition.  *Dinh v. Mukasey*, 2:08-cv-00196-JCM-LRL.  The case was dismissed upon a stipulation by the parties to hold the interview necessary to process the Form I-130 Petition.

On June 16, 2008, USCIS interviewed Dinh and Chau.  During the interview, Dinh allegedly learned for the first time about Duran's conviction.  On July 1, USCIS issued a Notice of Intent to Deny ("NOID") to Chau under 8 U.S.C. § 1154(b) based on Duran's conviction for marriage fraud in relation to the Dinh-Duran marriage.  Chau did not respond to the NOID, and, on December 15, USCIS denied the Form I-130.

Dinh's then-counsel, Mr. Albert C. Lum, recommended that she not appeal the ruling, but instead be placed in removal proceedings so she could relitigate the Form I-130 Petition.  On May 5, 2009, Dinh was placed in removal proceedings.  She was initially charged with immigration fraud under 8 U.S.C. § 1227(a)(1)(B) and overstaying her visa under 8 U.S.C. § 1227(a)(1)(A).  On October 5, the Government withdrew the fraud charge.

On November 15, 2009, Chau filed a new Form I-130 Petition.  (AR 486–87.)  On February 1, 2010, Dinh and Chau interviewed with USCIS.  On April 28, 2010, USCIS denied the Form I-130 Petition on the grounds that there was no evidence that the Dinh-Duran marriage was in good faith.  (AR 389–92.)

### D.   The First Appeal to BIA

On May 14, 2010, Chau filed a timely appeal with the Board of Immigration Appeals ("BIA").  On September 30, 2011, the BIA vacated USCIS's decision and remanded with instructions for USCIS to issue a NOID to Chau.  On February 6, 2012, USCIS issued the NOID to Chau.  (AR 74–79.)

1     On March 13, 2012, Chau responded to the NOID.  (AR 67–137.)  Chau's response

2 contained arguments which are substantially similar to the arguments made in Plaintiffs' response

3 to Defendants' motion for summary judgment.  Attached to the response were (i) copies of

4 various websites purporting to explain Vietnamese tradition and custom, including arranged

5 marriages; (ii) e-mails substantiating that Dinh applied to two colleges in Utah for the spring of

6 2005; (iii) Dinh's CSN transcripts; (iv) affidavits by Dinh and Hoang; (v) Dinh's flight itinerary

7 to Philadelphia in January 2005; and (vi) the Form I-485 that Dinh submitted on October 23,

8 2006.  Chau did not submit any documents showing any property or financial arrangements

9 between Dinh and Duran.

10     **E.     The Second Appeal to BIA**

11     On March 20, 2012, USCIS again denied the Form I-130 Petition.  (AR 38–46.)  On April

12 17, Dinh appealed to the BIA.  On September 11, 2012, the BIA adopted USCIS's opinion and

13 dismissed the appeal.  (AR 4–6.)

14     **F.     The Instant Case**

15     On October 11, 2012, Plaintiffs filed the Complaint.  (Dkt. No. 1.)  The defendants are

16 (i) the United States of America; (ii) Jeh C. Johnson, in his official capacity as Secretary of the

17 Department of Homeland Security; [4] (iii) Eric H. Holder, Jr., in his official capacity as Attorney

18 General of the United States; (iv) Alejandro Mayorkas, in his official capacity as Director of

19 USCIS; and (v) Leander B. Holston, in his official capacity as Officer in Charge of the USCIS

20 local office in Las Vegas, Nevada.

21     Plaintiffs assert that this Court has jurisdiction under section 702 of the Administrative

22 Procedure Act ("APA"), 5 U.S.C. § 702, the Mandamus Act, 28 U.S.C. § 1361, and the

23 Immigration and Nationality Act of 1952, as amended ("INA"), 8 U.S.C. §§ 1101–1537.

24 Plaintiffs seek relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, the All

25 Writs Act, 28 U.S.C. § 1651, and the Administrative Procedure Act, 5 U.S.C. §§ 704–706.  In

26

27

28     [4] In the Complaint, Plaintiffs named Janet Napolitano as a defendant in her official capacity as
Secretary of DHS.  Jeh C. Johnson has since replaced Ms. Napolitano in that position.

1    particular, Plaintiffs seek judicial declarations that (1) 28 U.S.C. § 1154(c) does not bar Dinh

2    from receiving immigration benefits; (2) Dinh entered the marriage with Duran in good faith; and

3    (3) Dinh did not seek to obtain the status of LPR based upon the marriage to Duran.  Plaintiffs

4    also request an order that USCIS re-adjudicate the operative Form I-130 Petition (relating to the

5    Dinh-Chau marriage) and that USCIS cannot rely on 28 U.S.C. § 1154(c) to deny that petition.

6    Finally, Plaintiffs request costs and fees under 28 U.S.C. § 2412.

7

8    **II.    ANALYSIS**

9        **A.    Standing**

10        Defendants challenge Dinh's standing because she is the intended beneficiary of a Form I-

11    130 Petition rather than a petitioner.  The standing inquiry involves "both constitutional

12    limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v.*

13    *Seldin*, 422 U.S. 490, 498 (1975).

14        A party has constitutional standing under Article III of the U.S. Constitution if she has

15    suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant and that

16    likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

17    560–61 (1992).  The agency's denial of the I-130 petition certainly injured Dinh as she was thus

18    prevented from adjusting her status to lawful permanent resident on the basis of being Chau's

19    wife.  The denial is obviously traceable to the agency, and this Court is capable of redressing the

20    injury.

21        Prudential standing refers to a body of "judicially self-imposed limits on the exercise of

22    federal jurisdiction," *Allen v. Wright*, 468 U.S. 737, 751 (1984), "founded in concern about the

23    proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at

24    498.  As relevant here, one of the requirements for prudential standings is that "the plaintiff

25    generally must assert his own legal rights and interests, and cannot rest his claim to relief on the

26    legal rights or interests of third parties." *Valley Forge Christian Coll. v. Am. United for*

27    *Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (internal quotation marks and

28    citation omitted).  In other words, third-party standing is not allowed.  The applicable standard is

1    "whether the interest sought to be protected by the complainant is arguably within the zone of

2    interest to be protected or regulated by the statute . . . in question." *Bennett v. Spear*, 520 U.S.

3    154, 163 (1997) (internal quotation marks and citations omitted).  Courts have repeatedly held

4    that the beneficiary of a Form I-130 Petition, such as Dinh, is within the zone of interests of 8

5    U.S.C. § 1154(a), which, among other things, establishes the petitioning procedure for an alien

6    spouse to obtain classification as an "immediate relative." *See, e.g.*, *Bangura v. Hansen*, 434 F.3d

7    487, 499 (6th Cir. 2006); *Taneja v. Smith*, 795 F.2d 355, 357 n.7 (4th Cir. 1986) (collecting

8    cases); *Oddo v. Reno*, 17 F. Supp. 2d 529, 531 (E.D. Va. 1998).

9            Therefore, Dinh has both constitutional and prudential standing.

10           **B.    Jurisdiction under the Mandamus Act**

11           Defendants contend the Court lacks jurisdiction under the Mandamus Act, 28 U.S.C.

12    § 1361. (Mot. Summ. J. at 13 n.6, Dkt. No. 13.)  They are correct.  The Supreme Court has held

13    that mandamus is an "extraordinary remedy" and that "petitioners must show that they lack

14    adequate alternative means to obtain the relief they seek." *Mallard v. U.S. Dist. Court for S. Dist.*

15    *of Iowa*, 490 U.S. 296, 309 (1989).  Mandamus is unavailable here because the APA provides an

16    alternative means of relief for Plaintiffs. *Independence Min. Co., Inc. v. Babbitt*, 105 F.3d 502,

17    507 (9th Cir. 1997); *Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1161 (N.D. Cal. 2007).  As a

18    practical matter, however, Defendants gain nothing by nixing the Mandamus Act claim because

19    "the result and the analysis that flow from [the APA and the Mandamus Act] are the same."

20    *Dong*, 513 F. Supp. 2d at 1161; *Independence Min. Co.*, 105 F.3d at 507 ("[T]he Supreme Court

21    has construed a claim seeking mandamus [under the Mandamus Act] , in essence, as one for relief

22    under § 706 of the APA." (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230

23    n.4 (1986))); *Hernandez-Avalos v. I.N.S.*, 50 F.3d 842, 845 (10th Cir. 1995) ("A mandatory

24    injunction issued under the APA is essentially in the nature of mandamus." (internal quotation

25    marks and citation omitted)).  However, the lack of jurisdiction under the Mandamus Act does not

26    mandate dismissal of the case because jurisdiction is afforded under the APA.

27

28

### C.   Standard of Review / Summary Judgment

This Court has jurisdiction to review a final agency decision denying an I-130 petition on the basis of marriage fraud under the judicial review provisions of the APA. *Ginters v. Frazier*, 614 F.3d 822, 828–29 (8th Cir. 2010); *Sheikh v. U.S. Dep't of Homeland Sec.*, 685 F. Supp. 2d 1076 (C.D. Cal. 2009). Under the APA, the Court reviews agency decisions to determine if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The Court's review is limited to the administrative record that was before the agency when the agency made its decision. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Baria v. Reno*, 94 F.3d 1335, 1340 (9th Cir. 1996). An agency, in reaching its decision, "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). However, the Court's scope of review is narrow; it should not substitute its judgment for the agency's. *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

The Federal Rules of Civil Procedure provide for summary adjudication when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, Rule 56's "material-fact" standard does not apply here because the Court's role is limited to reviewing the administrative record. *Zemeka*, 2013 WL 6085633 at \*4, 5. The agency's role is to resolve factual issues. *Id.* "[T]he function of the district court is to determine whether or not *as a matter of law* the evidence in the administrative record permitted the agency to make the decision it did." *Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 89–90 (D.D.C. 2009) (emphasis supplied). Therefore, Plaintiffs' argument that numerous questions of fact preclude summary judgment is incorrect.

### D.   I-130 Petitions and Sham Marriages

A U.S. citizen may petition for his spouse (the beneficiary) to be classified as an "immediate relative" by filing a Form I-130 Petition for Alien Relative. 8 U.S.C. § 1151(b)(2)(A)(i); 8 C.F.R. §§ 204.1(a)(1), 204.2(a). If granted, this classification allows the

1  spouse to "jump the line" and immediately apply for temporary lawful permanent resident

2  ("LPR") status by filing a Form I-485 Application to Register Permanent Resident or Adjust

3  Status.  8 U.S.C. §§ 1151(b)(2), 1255(a).

4          USCIS, however, cannot approve a Form I-130 Petition if the beneficiary previously

5  entered a sham marriage to evade immigration laws.  The applicable statute provides:

6          Notwithstanding the provisions of subsection (b) of this section[5] no petition shall
           be approved if (1) the alien has previously been accorded, or has sought to be
7          accorded, an immediate relative or preference status as a spouse of a citizen of the
           United States . . . by reason of marriage determined by the Attorney General to
8          have been entered into for the purpose of evading the immigration laws or (2) the
           Attorney General has determined that the alien has attempted or conspired to enter
9          into a marriage for the purpose of evading the immigration laws.

10  8 U.S.C. § 1154(c).  Put more simply, "[a] marriage entered into for the purpose of evading

11  immigration laws thus precludes a beneficiary from ever receiving 'immediate relative' status

12  from a subsequent I-130 petition."  *Zemeka*, 2013 WL 6085633 at *4.

13         On behalf of the Attorney General, a USCIS district director determines whether

14  § 1154(c) applies to any given petition.  *See Matter of Tawfik*, 20 I. & N. Dec. 166, 168 (B.I.A.

15  1990).  "In making that adjudication, the district director may rely on any relevant evidence

16  having its origin in prior Service proceedings involving the beneficiary, or in court proceedings

17  involving the prior marriage."  *Id.*  However, the district director must make an independent

18  determination of whether the prior marriage was fraudulent based on the evidence before the

19  district director; she may not rely solely upon a prior determination of sham marriage.  *Id.*

20         To reject an I-130 Petition on these grounds, a "reasonable inference" of a prior sham

21  marriage is insufficient; there must be "substantial and probative evidence" that the "beneficiary

22  entered into a marriage for the primary purpose of obtaining immigration benefits."  *Id.*; *Damon*

23  *v. Ashcroft*, 360 F.3d 1084, 1088 (9th Cir. 2004) ("Whether Sung Hee entered into the qualifying

24  marriage in good faith is an intrinsically fact-specific question reviewed under the substantial

25  _____

26         [5]In relevant part, 8 U.S.C. § 1154(b) provides: "After an investigation of the facts in each case
    . . . , the Attorney General shall, if he determines that the facts stated in the petition are true and that the
27  alien in behalf of whom the [Form I-130] petition is made is an immediate relative . . . or is eligible for
    preference . . . , approve the petition[.]"  The mandatory "shall" of subsection (b) is modified by the
28  language in subsection (c).

1    evidence standard.").  It is not necessary that the beneficiary obtained the desired benefit.  8

2    C.F.R. § 204.2(a)(ii).  Under the deferential substantial evidence standard, an agency's findings

3    may not be overturned "unless the evidence presented would *compel* a reasonable finder of fact to

4    reach a contrary result."  *Family, Inc. v. U.S. Citizenship & Immigration Servs.*, 469 F.3d 1313,

5    1315 (9th Cir. 2006) (internal quotation marks and citation omitted, emphasis in original).

6          "The central question is whether the bride and groom intended to establish a life together

7    at the time they were married."  *Laureano*, 19 I. & N. Dec. at 2; *cited with approval in Damon*,

8    360 F.3d at 1088.  "Evidence to establish intent could take many forms, including, but not limited

9    to, proof that the beneficiary has been listed as the petitioner's spouse on insurance policies,

10   property leases, income tax forms, or bank accounts; and testimony or other evidence regarding

11   courtship, wedding ceremony, shared residence, and experiences."  *Id.*; *see also* 8 C.F.R.

12   § 204.2(a)(1)(i)(B) (listing similar types of documents).  Evidence of post-marriage conduct is

13   relevant, but only insofar as it sheds light on the parties' subjective intent at the time they were

14   married.  *Bark v. I.N.S.*, 511 F.2d 1200, 1202 (9th Cir. 1975); *Laureano*, 19 I. & N. Dec. at 2.

15         The legal standard is somewhat illogical.  It is not necessarily true that a marriage entered

16   into *without* the intent to establish a life together was therefore entered into with the primary

17   purpose of evading the immigration laws.  *See Singh v. U.S. Dep't of Justice*, 461 F.3d 290, 294

18   n.3 (2d Cir. 2006) ("[Petitioner's] failure to satisfy *his* burden of showing good faith is not

19   enough to establish that his first marriage was a sham intended to evade the country's

20   immigration laws." (emphasis in original)); Laura L. Lichter, *Litigating the Denial of a Marriage-*

21   *Based Immigr. Petition Part I: Creating a Strategic Record*, 11-09 IMMIGR. BRIEFINGS 1 (2011)

22   (noting the "significant conceptual distinction between the lack of evidence to carry a petitioner's

23   burden and the presence of record materials showing an intent to defraud the government").  In an

24   analogous criminal case addressing fraudulent marriages, the Ninth Circuit elaborated on this

25   point:

26          Marriages for money or other ulterior gain are as ancient as mankind, yet may still
            be genuine, and marriage fraud may be committed by one party to the marriage, or
27          a person who arranged the marriage, yet the other spouse may genuinely intend to
            marry.  *See Genesis* 29:18–30 (Jacob honestly married, twice, but Laban had
28          fraudulently caused him to marry Leah and thereby extorted an additional seven

1
2

years of work).  The ulterior motive of financial benefit or immigration benefit does not make the marriage a fraud, though it may be evidence that the marriage is fraudulent.

3

*United States v. Tagalicud*, 84 F.3d 1180, 1185 (9th Cir. 1996).

4
5
6
7
8
9
10
11
12
13

The Ninth Circuit, however, in a recent opinion collapsed the two inquires.  "In determining whether [the beneficiary] entered into her marriage in good faith, and not for the purpose of procuring an immigration benefit, the central question is whether she and [her former husband] intended to establish a life together at the time they were married."  *Damon*, 360 F.3d at 1088.  Likewise, the Third Circuit recently held that where substantial evidence sustained the conclusion that a couple did not intend to establish a life together, that marriage was fraudulent as contracted for the purpose of evading the immigration laws.  *Malik v. Attorney Gen. of U.S.*, 659 F.3d 253, 257–58 (3d Cir. 2011); *see also* 3A Am. Jur. 2d *Aliens & Citizens* § 353 (2013) ("[O]therwise valid marriages entered into by parties not intending to live together as husband and wife are not recognized for immigration purposes.").

14
15
16
17
18
19

The result of this collapsed inquiry is not as harsh as it may seem though.  The BIA has been deferential to the "myriad permutations of human relations" that may constitute a "life together."  Lichter*, supra*, 11-08 Immigr. Briefings at *1 (citing *Matter of Peterson*, 12 I. & N. Dec. 663 (B.I.A. 1968)).  In *Peterson*, the BIA held that a marriage was bona fide where the husband admitted marrying his immigrant spouse for the purpose of obtaining a housekeeper. *Peterson*, 12 I. & N. Dec. at 664.

20
21
22

The Ninth Circuit has taken a similarly broad stance.  Agencies and courts should not impose their own subjective views of what constitutes the appropriate behavior of a married couple or "what a 'real' marriage is."  *Damon*, 360 F.3d at 1089.

23
24
25
26

The concept of establishing a life as marital partners contains no federal dictate about the kind of life that the partners may choose to lead.  Any attempt to regulate their life styles, such as prescribing the amount of time they must spend together, or designating the manner in which either partner elects to spend his or her time, in the guise of specifying the requirements of a bona fide marriage would raise serious constitutional questions. . . . Aliens cannot be required to have more conventional or more successful marriages than citizens.

27
28

*Bark*, 511 F.2d at 1202.  The proper analytical focus is on the objective evidence of the parties' subjective intent to establish a life together at the time of marriage.  *Damon*, 360 F.3d at 1089

1   ("An immigration judge's personal conjecture cannot be substituted for objective and substantial

2   evidence." (internal quotation marks and citations omitted)).

3          The Government has the burden of providing substantial and probative evidence that the

4   prior marriage was a sham. *Matter of Kahy*, 19 I. & N. Dec. 803, 806 (B.I.A. 1988) ("[W]here

5   there is evidence in the record to indicate that the beneficiary has been an active participant in a

6   marriage fraud conspiracy, the burden shifts to the petitioner to establish that the beneficiary did

7   not seek nonquota or preference status based on a prior fraudulent marriage."); *Laureano*, 19 I. &

8   N. Dec. at 2; SARAH B. IGNATIUS & ELISABETH S. STICKNEY, IMMIGR. LAW & FAMILY § 12:11

9   (2013); *see Smolniakova*, 422 F.3d at 1041.  Although the lead BIA case, *Kahy*, states that the

10  burden shifts to the petitioner upon the Government's provision of "evidence," not just any

11  amount of evidence places the burden on the petitioner.  If it did, then an amount less than

12  "substantial" could ultimately be sufficient for the Government to prevail.  The proper measure of

13  the evidence necessary to shift the burden is "substantial evidence."  *See Abufayad v. Holder*, 632

14  F.3d 623, 631 (holding "that the BIA's determination that the Government met its burden of

15  introducing 'some evidence' of Abufayad's inadmissibility [was] supported by substantial

16  evidence"); *Zemeka*, 2013 WL 6085633 at *6 (holding that "substantial evidence" supported

17  placing the burden on the petitioner to establish the *bona fides* of his prior marriage).

18         If USCIS discovers substantial evidence related to marriage fraud, it must issue a NOID to

19  the petitioner.  8 C.F.R. § 103.2(b)(8)(iv).  "The NOID informs the petitioner of 'the derogatory

20  information' in question and affords him the 'opportunity to rebut the information and present

21  information in his/her own behalf before the decision is rendered.'"  *Zemeka*, 2013 WL 6085633

22  at *5 (quoting 8 C.F.R. § 103.2(b)(8)(iv), (b)(16)(i)).  "Upon receiving the NOID, the burden

23  shifts to the petitioner to rebut USCIS's finding of fraud and establish that a prior marriage was

24  not 'entered into for the purpose of evading immigration laws.'"  *Id.* (quoting *Kahy*, 19 I. & N.

25  Dec. at 805 n.2).  Of course the burden shifts to the petitioner only if the determination of fraud

26  underlying the NOID is based on substantial evidence.  *See Kahy*, 19 I. & N. Dec. at 806.

27         In sum, the essential question is whether, as a matter of law, substantial and probative

28  evidence in the record supports the agency's finding that Dinh did *not* intend to establish a life

1   together with Duran at the time of their marriage.  Although the agency may find that a marriage

2   is fraudulent based on either party's lack of *bona fide* intent and therefore deny an I-130 Petition,

3   the denial of a subsequent I-130 Petition for a prior fraudulent marriage must rely on the

4   beneficiary's (Dinh's) intent to evade immigration laws in that prior marriage rather than the prior

5   petitioner's (Duran's) intentions.  In other words, there is no transferred intent from one spouse to

6   another that carries forward to a subsequent I-130 Petition.  *See Kahy*, 19 I. & N. Dec. at 806.

7   However, depending on circumstance, the prior petitioner's (Duran's) intent to evade immigration

8   laws may be evidence of the beneficiary's (Dinh's) same intent.

9        Because the BIA's opinion expressly adopts and supplements USCIS's decision, the Court

10  reviews both.  *Salazar-Paucar v. I.N.S.*, 281 F.3d 1069, 1073 (9th Cir. 2002) ("When the BIA

11  conducts a *de novo* review of the IJ's decision, as here, we review the BIA's decision rather than

12  the IJ's, except to the extent that the BIA expressly adopts the IJ's ruling.").

13       **E.   Application of Law to Facts: the Dinh-Duran Marriage**

14            **1.   "Sought to be accorded"**

15       Plaintiffs contend that § 1154(c) is inapplicable because Dinh did not seek "to be

16  accorded" immediate relative status as Duran's wife.  Although Dinh admits she signed the Form

17  I-485 Application, she avers that she did not date that form and that, one month after the marriage

18  and several months before the Form I-485 was submitted to USCIS, she instructed her mother to

19  tell Hoa and Duran *not* to file the immigration forms.  Dinh also argues that because the Form I-

20  485 was "rejected" rather than "accepted" or adjudicated, she did not seek "to be accorded"

21  immediate relative status.

22       Defendants argue that Dinh "sought to be accorded" immigration benefits because she

23  signed the Form I-485 and that Form was then submitted to USCIS (albeit several months later).

24       The Court is unaware of any precedent interpreting the phrase "sought to be accorded."

25  There is evidence in the record that, as of about one month after the wedding, Dinh

26  communicated her desire that the immigration papers *not* be filed.  (Dinh Aff. ¶ 17, AR 119.)

27  However, she knowingly and voluntarily signed the Form I-485 immediately after the wedding,

28  and she delegated the form's filing to Hoa or Duran.  The Court must infer that Dinh intended the

form to be filed, at least during the one month before she instructed her mother to tell Hoa not to file the form, and therefore she "sought to be accorded . . . preference status as the spouse of a citizen of the United States."  A signature alone may not be enough to establish that a person "sought to be accorded" preference status, but signing the form and doing nothing to prevent the filing from occurring for one month is.

Section 1154(c) is not inapplicable on this ground.  Dinh "sought to be accorded" immediate relative status as Duran's spouse.

### 2.     Conspiracy Withdrawal

Dinh argues that her communication to her mother that she did not want to marry Duran and not to file the immigration papers amounted to a withdrawal from the conspiracy.  This is presumably a reaction to the second part of § 1154(c), which provides that a Form I-130 Petition must be denied if "the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws."  However, neither the USCIS decision nor the BIA affirmance held that Dinh conspired in this manner, nor is there any evidence in the record of a conspiracy. The Court assumes that Dinh is not admitting to this type of conspiracy in order to establish that she withdrew from it.  Because conspiracy is not at issue, this argument is irrelevant.

### 3.     Intent to Establish a Life Together at the Time of Marriage

On March 20, 2012, USCIS found that the Dinh-Duran marriage was fraudulent.  (AR 38–46.)  Of note, the agency considered (i) affidavits by Dinh and Hoang (Dinh's mother); (ii) briefings submitted by Plaintiffs' current counsel, Mr. Xavier Gonzales; (iv) briefings by Plaintiffs' former counsel, Ms. Silvia L. Esparza; and (v) documents submitted by Plaintiffs which purport to document Vietnam and Vietnamese culture, including arranged marriages. USCIS's finding was based on the following evidence in the record:

> (1) Duran pled guilty to aiding and abetting the attempted entry of an illegal alien by means of a sham marriage.
>
> (2) The Dinh-Duran marriage did not comport with the "pomp and circumstance" normally surrounding a traditional Vietnamese arranged marriage.  Neither Prince nor Duran is Vietnamese.  There is no evidence that either was acquainted with traditional Vietnamese customs.  It is very unlikely that a proper arranged marriage would be planned when one of the parties was presently married or recently divorced, as the Duran marriage occurred about one month after the Prince

divorce.  Also, the record contains no evidence that Dinh's family ever met Duran's family.

(3) USCIS has seen many one-sided fraudulent marriage schemes, but never one in which the alien was the unknowing party.

(4) There is no evidence in the record to support Dinh's claim that she made arrangements to attend school in Utah in January 2005.[6]  Even if she had provided this evidence, it would be of limited evidentiary value because Dinh's first husband (Prince) also lived in Utah.

(5) There is no substantive evidence in the record of commingled assets, joint property, or any other joint financial arrangements.

(6) There is no evidence in the record about how Dinh and Duran communicated subsequent to their marriage.  Defendants point out that Dinh did not go to Utah to try to work it out with Duran as would normally be expected.

(8) There are no photographs in the record of Dinh's local friends or college colleagues attending the wedding.

(9) There was plenty of time (four months) between the marriage and the filing of the immigration papers.  Dinh therefore had a "reasonable opportunity to decide not to move forward with the filing of her adjustment of status application."

(10) Chau submitted nothing to support the *bona fides* of the Duran marriage in response to the NOID.

(11) Dinh did not provide a reasonable explanation as to "why someone other than [her] would be motivated to submit and pay for applications on her behalf after the decline in her marriage [to Duran]."

(12) The affidavits by Dinh and Hoang are of little evidentiary value without supporting documentary evidence.

The BIA adopted USCIS's decision and made the following additional points:

(1) Dinh's claim that she was an unwitting participant in the marriage fraud for which Duran was convicted is belied by the fact that she had two consecutive marriages to different U.S. citizens, each ending in divorce after only a few months.  (AR 5.)

(2)  Dinh paid $12,000 to a broker to marry her first husband, but never lived with him.  (AR 5.)

(3) It was to Dinh's benefit that the immigration forms be filed; there is no plausible reason why Duran would file them some four months after the marriage.

---

[6] This is incorrect.  Exhibit B to Dinh's March 9, 2012 filing with USCIS is a copy of a series of e-mails demonstrating that Dinh applied to the University of Utah College of Nursing and to Westminster College International in Salt Lake City, Utah.  (AR 105–09.)  However, these e-mails date from November 2 to November 22, 2004, which was after the Prince divorce and before the Duran wedding.  (*Id.*)

1

   (4) The affidavits of Dinh and Hoang are contradictory and self-serving and thus do not outweigh the substantial evidence in the record.

2

   On appeal to this Court, Plaintiffs argue there is *not* substantial and probative evidence in

3

the record that Dinh intended a sham marriage with Duran.  Moreover, they argue USCIS and the

4

BIA misinterpreted the record evidence and ignored various facts which militate in Dinh's favor.

5

In particular, Plaintiffs highlight the following:

6

   (1) In January 2005, about six to eight weeks after the wedding, Dinh told Duran (indirectly through Hoang and possibly through Hoa) *not* to file the immigration

7

forms.  (Dinh Aff. ¶¶ 17, 19, AR 119; *see* Hoang Aff., AR 118.)

8

   (2) In January 2005, Dinh sought permission from her mother to divorce Duran once she realized Duran did not want a real marriage, as he was not returning her

9

phone calls.  (Dinh Aff. ¶¶ 10, 11, 14, AR 119.)

10

   (3) Dinh and her mother wanted Dinh to marry for financial benefit to help with college tuition.  (Dinh Aff. ¶ 2, 3, 8, AR 116–17; Dinh Aff., AR 126.)

11

12

   (4) Arranged marriages for economic reasons often occur within a short amount of time, even at the first meeting between two persons.  (AR 84, 86.)

13

   (5) It is common in the Vietnamese culture to rely on parental choice of matchmaker and of arranged spouse.  (Dinh Aff. ¶ 4, AR 117; *see* AR 83, 85, 266,

14

272.)

15

   (5) Dinh intended to return to Utah in January 2005 to attend college, as evidenced by her college applications.  (AR 105–09.)

16

17

   (6) Dinh intended to live with Duran and "fulfill all the incidences of marriage" with him.  (Dinh Aff. ¶ 5, AR 117.)

18

   (7) Dinh was lawfully present in the United States on an F-1 student visa when her marriage to Duran occurred.  Therefore, she did not have an immediate need for a

19

change of immigration status.

20

   (8) Dinh did not date the immigration forms and took no affirmative steps to file them.  (Dinh Aff. ¶ 16, AR 119.)

21

22

   (8) USCIS conducted no interviews or other background research regarding the Dinh-Duran marriage.

23

   (9) Dinh began her relationship with Chau before the Duran petition was submitted to USCIS.  (Dinh Aff. ¶ 13, AR 118.)

24

25

   (10) The Dinh-Duran immigration forms were submitted without Dinh's knowledge.  (Dinh Aff. ¶ 20, AR 120.)

26

   As noted above, the Court's role is not to assess the affiants' credibility or to weigh the

27

evidence.  The review is more holistic: is there "substantial and probative evidence" in the record

28

that Dinh did *not* intend to establish a life with Duran at the time they were married.

The Agency[7] relied heavily on the lack of "pomp and circumstance" surrounding the Duran wedding to counter Plaintiff's assertion that the Dinh-Duran marriage was a culturally acceptable arranged marriage. It is unclear, however, on what basis the Agency chose to rely on the evidence describing elaborate, ritualistic, and time-consuming arranged marriages instead of the evidence stating that arranged marriages for economic reasons often occur on a very short time frame. The evidence describing arranged marriages does not seem especially probative. It is in the form of printouts from various travel and news websites and contains general information for tourists and sensationalist warnings against marriage fraud scams.

Although the Agency was free to weigh this evidence as it saw fit, the Court cannot "reasonably discern" the "[A]gency's path" from the smattering of inconsistent evidence about arranged marriages in the Vietnamese culture to the finding that Dinh's marriage to Duran did not constitute a culturally acceptable arranged marriage. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agriculture*, 18 F.3d 1468, 1478 (9th Cir. 1994) ("A court may not supply a reasoned basis for the agency's action that the agency itself has not given. However, a court can uphold an agency decision of less than ideal clarity if the agency's path may reasonably be discerned." (internal quotation marks and citations omitted)). In the absence of a reasoned basis to selectively rely on one portion of the conflicting evidence about arranged marriages, it appears the Agency inappropriately imposed its own subjective views of what a culturally proper arranged marriage should look like. *See Damon*, 360 F.3d at 1089; *Bark*, 511 F.2d at 1201–02.

Even viewed collectively, the remainder of the evidence relied upon by the agency is not "substantial and probative." Duran's guilty plea cannot be imputed to prove Dinh's intent. Just because USCIS had never seen a one-sided fraudulent marriage scheme where the alien is the unknowing party does not mean they do not exist. The Indictment against Hoa alleges a conspiracy in which U.S. citizens were paid between $500 and $10,000 to marry Vietnamese nationals by marriage arrangers, who were paid approximately $30,000 by each Vietnamese

---

[7] Because the BIA expressly adopted USCIS's opinion, the Court collectively refers to USCIS and the BIA as the "agency."

national.  (AR 324–27.)  This scheme did not appear to depend on the Vietnamese nationals obtaining any immigration benefit.  The arrangers and the U.S. citizens apparently obtained huge sums for the effort of recruiting Vietnamese nationals and making sure that a marriage occurred. What transpired after the marriages seems immaterial to the U.S. citizens and the arrangers. Whether or not the charges in the Indictment are true, this alleged conspiracy shows that a one-sided fraudulent marriage with an unknowing alien participant could occur.

There is evidence in the record that Dinh applied to two colleges in Utah, although these applications preceded the Duran marriage.  Therefore, Dinh did not make plans to attend college in Utah so that she could establish a married life with Duran.  Dinh averred that she "always had the intention to establish a married life with whomever my mother chose for me to marry."  (Dinh Aff. ¶ 7, AR 258.)  This appears consistent with the Vietnamese custom of accepting a parent's choice of spouse, and does not necessarily prove that Dinh did not intend to establish a married life with Duran.  It also seems consistent with the $12,000 payment to arrange the Prince marriage and the nearly immediate arrangement to marry Duran once the Prince marriage failed. (*See* Dinh Aff., AR 126–27.)  The $12,000 fee appears to have been for the arrangement of a marriage for Dinh, even if it took several spouses to find the "right" spouse.  (*See id.*)

Cutting against Dinh is that there is no documentation of joint property or financial arrangements with Duran, and no evidence that any friends or colleagues attended the wedding. On the other hand, it seems quite natural that few, if any, of Dinh's friends or coworkers could attend a hastily-organized wedding in another state.  It is also unclear why she did not take more affirmative steps to communicate with Duran (possibly in person, by traveling to Utah) in January 2005 when he would not return her phone calls.  These facts support a reasonable inference, but nothing more, that the marriage was a sham.

It seems true, as the agency concluded, that four months is sufficient time to decide not to move forward with the filing of immigration papers.  And toward the beginning of these four months Dinh decided just that—she instructed that the immigration forms *not* be filed.  Her divorce from Duran while the immigration forms were pending with USCIS is an objective indication that she did not marry Duran with the primary purpose of evading the immigration

laws.  *See Tawfik*, 20 I. & N. Dec. at 169 ("[W]hile the petition filed by the beneficiary's first United States citizen wife was still pending . . . , the beneficiary divorced that wife, without knowledge as to what the outcome of the petition might be. . . . [H]is divorce, prior to a decision on the petition which may have been to his favor, tends to reflect the bona fide nature of the marriage that he chose to terminate.").

Dinh's lack of knowledge that the immigration forms were filed also supports Plaintiffs' position.  In *Kahy*, the BIA dismissed an appeal of the denial of a Form I-130 Petition in part because "the petitioner ha[d] submitted no evidence that the visa petition was filed without the knowledge or approval of the beneficiary."  19 I. & N. Dec. at 807.  Here, there is evidence in the record (Dinh's affidavit) that Dinh was unaware that the forms were filed.  If Dinh had married Duran with the primary purpose of evading the immigration laws, it seems she would have proactively followed up to ensure the immigration forms were filed; she likely would not have allowed Duran to sit on them for four months before filing them.  Also, it seems she would not have sought a divorce from Duran as it could have raised red flags within USCIS.  Further, it seems she would not have knowingly lied on her October 23, 2006 Form I-485 (in relation to the Dinh-Chau marriage) by indicating that she had never before applied for LPR status if she were aware of the filing of the Dinh-Duran immigration forms, which included a Form I-485.  (AR 134.)

The Agency also points to Dinh's failure to provide a reasonable explanation as to why someone other than her would be motivated to submit and pay for applications on her behalf. Because there was not substantial and probative evidence that the Duran marriage was a fraud, the burden of proof did not shift to Dinh.  Thus, her lack of rebuttal evidence is of no moment.

The Court agrees that self-serving affidavits are suspect, especially when there is no supporting documentation.  But all affidavits are self-serving to some extent; if not, they would have no evidentiary value for the affiants.  *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007). And here, there is objective evidence that (i) Dinh intended to return to Utah to study, albeit with whomever she ended up marrying there; (ii) she divorced Duran before USCIS ruled on her immigration applications; (iii) she did not need an immediate change of immigration status,

although the Court understands that obtaining LPR status is of enormous long-term benefit even if one is not in imminent need of a change in status; and (iv) she indicated in her application for LPR status following the Chau marriage that she had never before applied for LPR status.

Several reasonable inferences could be drawn from the record evidence. However, reasonable inferences do not amount to "substantial and probative evidence." *Tawfik*, 20 I. & N. Dec. at 168. Based on the evidence in the record as to Dinh's intentions, a reasonable factfinder would be compelled to find that Dinh intended to establish a life with Duran at the time they were married, even if that life was motivated by short-term financial gain and did not align with the traditional notion of marriage for romantic purposes. *See Tagalicud*, 84 F.3d at 1185; *Peterson*, 12 I. & N. Dec. at 664.

Accordingly, section 1154(c) does not bar the approval of the Form I-130 Petition that Chau filed on Dinh's behalf.

III.   **CONCLUSION**

In accord with the above, the Court hereby ORDERS:

1. Defendants' motion for summary judgment (Dkt. No. 13) is DENIED.

2. This matter is remanded to USCIS to re-adjudicate the Form I-130 Petition and Form I-485 filed by Chau and Dinh on October 23, 2006. (AR 133–36, 514–15.) USCIS may not use 8 U.S.C. § 1154(c) as a basis to deny the Form I-130 Petition.

DATED this 14th day of July, 2014.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE